IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDREW MACKEY,

    Petitioner,

    v.

THOMAS G. HOFFMAN, Warden, *et al.*,

    Respondents.

No. C 07-4189 SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Andrew Mackey, currently incarcerated by the California Department of Corrections and Rehabilitation, filed this petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 concerning his 2004 conviction in San Francisco Superior Court. For the reasons discussed below, the Court DENIES the petition.

**BACKGROUND**

The California Court of Appeal described the facts of this case as follows:

I. FACTS AND PROCEDURAL HISTORY

    Mackey was charged by indictment with attempted murder and assault with a firearm on both Alford Johnson and Bryant Wilright, along with one count of being a felon in possession of a firearm. As to the attempted murder counts, it was alleged that Mackey had personally used a firearm, personally and intentionally discharged a firearm . . . and, in connection with the attempted murder of Johnson, personally and intentionally discharged a firearm . . . . The indictment further alleged that in committing the assaults Mackey personally used a firearm and, as to the assault on Johnson, inflicted great bodily injury. Two prior felony convictions were alleged as well.

    Mackey was initially represented by attorney Ira Barg. In January 2004, attorney Randall Knox was appointed in his stead. After a number of continuances, trial was set for Friday, June 18, 2004.

On June 18, attorney Joseph O'Sullivan appeared on Mackey's behalf and was substituted in as counsel of record . . . . The court indicated that the matter would be assigned out to trial the following Monday, June 21.  O'Sullivan did not request a continuance, and Mackey personally thanked the court for this scheduling.

On June 21, the case was assigned out to trial. A motion to dismiss under section 995, which O'Sullivan had filed on Mackey's behalf on June 14, was heard and denied.

The jury was selected on June 24 and 25. On June 25, the People sought an order terminating Mackey's telephone and visitation privileges, due to suspicions that he was behind threats made to Mackey's victims for the purpose of dissuading them from testifying at trial.  It appears from the record that this motion was granted.

### A. BEGINNING OF PROSECUTION CASE

The prosecution's first few witnesses were San Francisco Police Officers . . . along with victim Johnson. Their testimony disclosed the following.

On April 14, 2002, victims Johnson and Wilright were in Wilright's car in San Francisco's Potrero District, on their way to visit Johnson's grandmother.  Wilright parked the car, and Johnson got out. As Johnson walked toward the sidewalk, he saw Mackey, a former friend. Johnson, who had heard that Mackey was going to harm him if he returned to the neighborhood, said to Mackey, "What's up, Drew?"  Mackey replied, "What do you mean what's up?"  Johnson started to walk to the stairs leading to his grandmother's house, when Mackey pointed a black semiautomatic firearm at him and fired from about eight feet away.  The shot hit Johnson in the right leg, and he fell down the stairs.  Unable to get up, Johnson tried to cover himself in a fetal position.  Mackey walked down the stairs, stood over Johnson, and shot him three times in the stomach, twice in the chest, and in the legs, yelling something hostile at him as he fired.

Nine shell casings were recovered by a crime scene investigator at the shooting site.  Forensic tests later determined that they came from a .40-caliber semiautomatic handgun.

Johnson told the police at the scene that he had been shot by "Andrew."  At the hospital emergency room as well, he told a police officer that "Andrew Mackey" shot him . . . . and [later] identified Mackey in a photographic lineup.

Johnson was released from the hospital about two months after the incident. Although he moved away from the area for his own safety, he received a telephone call on his cell phone from Mackey around the beginning of trial.  Mackey claimed the shooting had been a misunderstanding.  Then Mackey read a portion of the grand jury transcript to Johnson and warned him that if he testified, "paperwork" would be out on him – meaning that Mackey would circulate copies of the grand jury transcript.  This would label Johnson a "snitch," and he would be killed.  Johnson testified at the trial nevertheless.

### B. *MARSDEN* HEARING, MISTRIAL MOTIONS, AND MACKEY'S DESIRE TO TESTIFY

After court reconvened the next morning, Mackey raised his hand and told the court in the presence of the jury: "Judge, there is a problem here, me and my lawyer ain't coming to agreement. I told him I want to testify, he wouldn't let me testify.  Told him few points of my case, he wouldn't do it.  I would like to have new counsel.  I don't feel I am getting a fair chance with my attorney."

. . . Out of the jury's presence, the court asked Mackey the reasons for his request. Mackey responded: "He [O'Sullivan] hasn't hit a lot of viewpoint in my case that I told him to go around. I told him I wanted to testify. He didn't have did anything he want to do, everything his way.  I don't feel he is in his best interest to continue on

2

what I am doing now unless I have the right counsel, please."

O'Sullivan responded by both requesting a mistrial based on Mackey's outburst in front of the jury and clarifying his disagreements with Mackey: "First of all, Your Honor, I would think that there should be a mistrial because I believe it's too prejudicial for the jury to have heard something like that. They will feel rightly or wrongly that I am inept in my defense of Mr. Mackey. So, I think that militates against anything that we would try to do. . . .

. . . .

O'Sullivan then explained why he thought it inadvisable for Mackey to testify: "I think Mr. Mackey is extremely smart street-wise and personality-wise, but I don't think he could handle cross-examination on the stand. I think it would be a disaster for him. [¶][1] I have gone over and told him of my efforts and the court's concurrence in keeping out the horrible events as I view them of his arrest some two or three months subsequent to this incident in Vallejo. I told him that all those things will come up. That the prosecution will try and make it look like an attempted carjacking, kidnapping, everything. And I think his record is such that it would be very foolish. [¶] ... [¶] And I would not allow him to testify. I understand he's got a fifth amendment right, but I would not be part of it for reasons that I don't feel comfortable discussing with the court. I have two ethical obligations."

The court denied Mackey's request for new counsel. Mackey does not challenge this ruling.

The court thereafter addressed the potential effect on the jury of Mackey's outburst. The court questioned the jurors individually about what they heard Mackey say and whether it prejudiced them. The court then discussed their responses with counsel in chambers. In the course of these discussions, O'Sullivan informed the court that "the defense does not have a case," he "would not allow [Mackey] to testify," and "[t]hat creates major issues because he has a constitutional right to testify, but I would not want to be a party to that."

When court was back in session, the trial judge informed the jury: ". . . [I] am telling you again that you are to disregard any of the comments that were made this morning in court by Mr. Mackey. And you are not to speculate about them or consider them in any way, they are not to be taken into account during your jury deliberations. And you shall have no discussions about them with yourselves or any one else . . . ."

At this point Mackey punched O'Sullivan a few times. The court later described the incident as follows: " . . . Mr. Mackey punched his attorney about three or four times on the shoulder, not particularly hard, but it was clearly done in the presence of the jury. And we will now have to voir dire the jury again . . . ."

In chambers, the court asked Mackey why he hit O'Sullivan. Mackey responded: "Because I couldn't believe you still made this guy be my attorney." . . . O'Sullivan made another motion for a mistrial, which was denied.

The discussion then returned to whether O'Sullivan should continue as Mackey's attorney. O'Sullivan introduced Mackey's former counsel, Knox, and advised the court that he had briefed Knox on the witnesses and that Mackey would accept Knox as new counsel. Knox represented that it would take him a few weeks to get ready for trial. Recognizing such a delay would cause them to "lose the jury," the court indicated it would consider only a two-day delay. The court further remarked: "at this point I find that this – the second outburst by Mr. Mackey just reinforced my earlier comments that I think he's doing things that he can to create a mistrial."

---

[1] The "[¶]" symbols appear in the California Court of Appeal opinion.

3

The trial judge, O'Sullivan, and Knox discussed at length whether Knox could be ready to represent Mackey in two days. To this end, O'Sullivan offered to give Knox an outline of his cross-examination of Wilright, and alternatively offered to spend two days preparing Knox and, if Knox still did not feel comfortable cross-examining Wilright, O'Sullivan would conduct the cross-examination before substituting out. Mackey would then have his option to produce witnesses or testify himself. Unable to obtain Knox's commitment to this timetable, however, the court ordered that the matter proceed, with Mackey represented by O'Sullivan.

The jurors were returned to the courtroom, and the judge asked them whether Mackey's actions in striking O'Sullivan's shoulder would affect their ability to serve: as a result of this inquiry, three jurors were excused, leaving 12 jurors but no alternates.

C. RESUMPTION OF PROSECUTION'S CASE

Victim Wilright substantially confirmed Johnson's testimony. . . . .

. . . .

Like Johnson, Wilright moved away after the incident. But about a week before trial, Wilright recounted, he received a telephone call from an acquaintance [who said he was Mackey's cousin and] offered Wilright a few hundred dollars not to testify at Mackey's trial. [He] also threatened Wilright implicitly, claiming he was trying to stop people from looking for him. . . .

. . . .

D. CONFLICTS COUNSEL AND MACKEY'S DECISION NOT TO TESTIFY

Before the People had rested their case, the court appointed conflicts counsel Freya Horne to advise Mackey on taking the stand in his own behalf. On July 2, 2004, Horne reported that she had spoken with Mackey on this subject for about 45 minutes on July 1, and she was satisfied at the conclusion of the meeting that Mackey no longer wanted to testify. . . . The court then clarified the matter further: "The Court: At this point you do not wish to testify; is that correct? [¶] [Mackey]: Yes."

E. DEFENSE CASE

Also on July 2, O'Sullivan informed the court that he had approximately five potential witnesses outside the courtroom, whom he had not interviewed but would be meeting with the next morning, and whom he would be prepared to call as witnesses on the morning of Tuesday, July 6.

On July 6, O'Sullivan called Taniesha Williams as a witness. Williams was married to Mackey's cousin, but was a friend of the Johnson family as well. She testified that around April 2002, Johnson always carried one or two revolvers with him whenever he was on Potrero Hill. She was not a witness to the shooting, however, and did not know if Johnson carried a gun that night.

Billy Courtney testified that he grew up with Mackey and Johnson. On the night before the shooting, Courtney claimed, he looked out his window and saw Mackey and Johnson arguing and fighting on Missouri Street. Courtney opened his door to see what was happening, when Mackey ran down the hallway and into his apartment. Courtney heard two or three shots. Mackey said to Courtney, "Get me out of here because these niggers are shooting at me." Courtney took Mackey to his house. In addition, Courtney testified, Johnson carried a gun and shot at someone on three or four occasions.

### F. PROSECUTION'S REBUTTAL TESTIMONY

In response to Courtney's testimony, Inspector Chaplin went to Courtney's apartment to take photographs of the view from his window. Inside Courtney's apartment, Chaplin discovered it was impossible for Courtney to have seen Mackey and Johnson in the parking lot as Courtney had testified. . . .

Courtney also took the stand in the prosecution's rebuttal case. He admitted that he did not see the shooting. He also admitted that he told Inspector Chaplin that he could not have seen anything to which he had testified as a defense witness. He claimed, however, that he nevertheless saw Johnson and Mackey "tussl[ing]" before the shooting.

San Francisco Police Officer Matthew Hanley recounted Mackey's resistance at the time of his arrest. After police officers conducting surveillance on Mackey's apartment observed Mackey get into a car with a woman and small child, Officer Hanley maneuvered his police vehicle in front of Mackey's car. Mackey, who had been sitting in the passenger seat, jumped on top of the woman who was driving. The car accelerated and smashed into Officer Hanley's car, and the tires spun and smoked and made a lot of noise. The woman driver raised her hands in the air and screamed. Another officer smashed open the passenger window in an attempt to pull Mackey out of the car, but the car accelerated backwards at a high rate of speed, spun backwards through the parking lot, and smashed into a parked car. Mackey jumped out of the car and fled, as the officers gave chase. Mackey attempted to carjack a limousine, tried to get inside an ice cream truck, and then got in the back seat of another woman's car, leaning over her as she screamed and pled with him because there were children in the area. Mackey ordered her to "go." As Officer Hanley closed in on him, Mackey tried to jump out of the car, but Hanley tackled and arrested him. Mackey instructed the woman in the car, "Don't say anything, I'm already in enough trouble."

The prosecution also introduced evidence that Mackey possessed the type of firearm that his victims recalled him using. Michael Desangles testified that in September 1997 Mackey approached him, pointed a black semiautomatic handgun at him, and took $20 from him. In addition, the parties stipulated that the San Francisco Police Department received a 911 call on the night of the shootings from a woman who reported that she heard six gunshots, then three gunshots, then one gunshot. The woman claimed she saw and heard nothing else related to the incident.

### G. VERDICT, NEW TRIAL MOTION AND SENTENCE

*1. Verdict*

The jury returned guilty verdicts on all counts and found the enhancement allegations to be true.

*2. New Trial Motion*

After the verdicts and before sentencing, Mackey retained attorney LeRue Grim. . . . [and] filed a motion for a new trial on the grounds of ineffective assistance of defense counsel. Specifically, Mackey contended, O'Sullivan had failed to investigate the case, look for witnesses, or adequately prepare for trial, and as a result Mackey was deprived of the potentially meritorious defense of self-defense.

. . . Mackey submitted a declaration stating he was visited by O'Sullivan twice before trial: O'Sullivan talked about his fee, Mackey claimed, but did not discuss the merits of the case or possible defenses. Further, Mackey asserted, he informed O'Sullivan that he shot Johnson in self-defense, identified the witnesses who could so testify, and asserted he wanted to testify on his own behalf.

In addition, Mackey submitted the declarations of four purported witnesses to the shooting . . . [who] declared, essentially, that it was Johnson who shot at Mackey first.

5

> Mackey also purported to explain his outbursts during the trial by claiming that it was actually O'Sullivan who had told him to do it. As to his verbal outburst, at the hearing on the new trial motion Mackey testified: "[O'Sullivan] [s]aid he was going on. He said things ain't going too well. We gonna lose this one. He said – he said: You're going to have to raise your hand in front of the judge and tell him you want a new attorney and cuss in front of the judge a little bit. You have to swear at me to the judge. [¶] ... [¶] He told me we have a *Marsden* motion, and he is going to try to dismiss hisself [*sic*] off my case so that give me a new trial."
>
> As to hitting O'Sullivan in front of the jury, Mackey explained that he and O'Sullivan planned the incident after the *Marsden* motion was denied. ". . . He said: well, that didn't work. He said: You are going to have to hit me in front of judge. The judge and jury won't be able to give you a fair trial if they see you hit me. . . . I looked at him, I said: man, is you serious? He said: Yeah. He said: Won't be no way the jury or the judge will be able to give you a fair trial if they see you hit me. . . . and the investigator came and sat down next to me . . . . He said: Joe wants you to hit him when the trial starts. He said that the jury won't be able to give you a fair trial if they see you hitting me. I said: man, is this going to work? He says: It's got to. The judge is going to have to grant a mistrial if he sees that. . . . The investigator told me: Don't hit him as soon as he come out, let him sit down and let the court go on a little bit, click my pen or move around in my seat, then hit Joe."
>
> The prosecution opposed the new trial motion, submitting among other things declarations from O'Sullivan and the defense investigator, Keith MacArthur. . . . O'Sullivan asserted that Mackey did not initially express a desire to testify or ever urge a theory of self-defense, and he never identified any self-defense witnesses or suggested there were any. Further, O'Sullivan explained, the police reports and two years of defense investigation and analysis by defense counsel did not disclose a basis for a self-defense theory. O'Sullivan also denied counseling Mackey to hit him or otherwise disrupt the trial.
>
> The court denied the new trial motion.
>
> *3. Sentence*
>
> Mackey was sentenced to a term of life with the possibility of parole, plus 25 years to life, in state prison.

*People v. Mackey*, No. A108743, 2006 WL 1120536, at *1-8 (Cal. Ct. App. Apr. 28, 2006) (attached as Ex. 4 to Respondents' Answer) (citations and footnotes omitted).

On April 28, 2006, the California Court of Appeal affirmed Mackey's conviction and denied his petition for writ of habeas corpus. On August 16, 2006, the California Supreme Court denied the petition for review and the petition for writ of habeas corpus. On August 15, 2007, Mackey filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus if the

6

> 1  adjudication of the claim (1) resulted in a decision that was contrary to, or involved an
> 2  unreasonable application of, clearly established Federal law, as determined by the
>    Supreme Court of the United States; or (2) resulted in a decision that was based on an
> 3  unreasonable determination of the facts in light of the evidence presented in the State
>    court proceeding.

28 U.S.C. § 2254(d). A decision is contrary to established law if it applies a rule that contradicts the law as set forth by the Supreme Court, or arrives at a different result in a case that is "materially indistinguishable" from a Supreme Court decision. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Unreasonable application of established law occurs when the court "correctly identifies the governing legal rule but applies it unreasonably to the facts." *Id.* Under AEDPA, although Supreme Court precedent is the only controlling authority, Ninth Circuit case law is persuasive authority for the purposes of review of previous state court decisions. *See Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir. 2002), *amended by* 311 F.3d 928 (9th Cir. 2002).

In reviewing a habeas corpus petition, a federal court must look at the last reasoned decision of the state court to determine whether that court's decision was contrary to or an unreasonable application of established federal law. *Id.* at 960-61. Here, the last reasoned decision of the state court is the decision issued by the California Court of Appeal.

**DISCUSSION**

Petitioner contends that he was denied effective assistance of counsel when his attorney, Joseph O'Sullivan: (1) used the defense of mistaken identification rather than self-defense, (2) did not allow petitioner to testify, (3) failed to adequately investigate his case, and (4) instructed petitioner to yell and strike him for the purpose of compelling a mistrial.

To establish ineffective assistance of counsel, petitioner must first show that his counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Court in *Strickland* emphasized that judicial scrutiny of counsel's performance is highly deferential, and a court must indulge a strong presumption that counsel's conduct fell within the wide range of

7

reasonable professional assistance. *Id.* at 689; *Wildman v. Johnson*, 261 F.3d 832, 838 (9th Cir. 2001). Because habeas relief is available only upon a showing that the state court's holding was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d), the Court's review of petitioner's ineffective assistance of counsel claim must be "doubly deferential." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam). In other words, the Court must analyse whether the California Court of Appeal, in "applying a heavy measure of deference to counsel's judgment," *Strickland*, 466 U.S. at 690, strayed so far from established Supreme Court precedent that its decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d).

## I. Self-defense vs. misidentification

Petitioner claims that his attorney should not have relied on the defense of misidentification and instead should have pursued a theory of self-defense. According to petitioner, he informed O'Sullivan that he shot Johnson in self-defense, that he wanted to testify on his own behalf, and that he had witnesses who supported the self-defense theory.

The California Court of Appeal held that "substantial evidence supports the conclusion that O'Sullivan did, in fact, discuss all aspects of the case and potential witnesses with Mackey, and Mackey never offered the self-defense possibility until after he was convicted." *Mackey*, 2006 WL 1120536, at *11.

> Based on the information O'Sullivan had, it was reasonable for him to conclude that there was no viable self-defense theory to pursue. Neither the police report nor the notes of Mackey's previous attorneys and defense investigators provided any evidence of self-defense. As the trial court found, Mackey's assertion that he told O'Sullivan of his desire to pursue a claim of self-defense was not credible: not only did O'Sullivan deny it, the fact that there is no indication in the files that Mackey ever mentioned self-defense or provided self-defense witnesses in the two years *before* O'Sullivan became counsel makes it rather unlikely he suddenly did so with O'Sullivan – or any such self-defense claim would be credible.

*Id.* (emphasis in original). The Court of Appeal also found that even if O'Sullivan should have considered the possibility of self-defense and pursued such a defense strategy, there was no prejudice in O'Sullivan's failure to do so because "the self-defense theory was not potentially meritorious. O'Sullivan's failure to assert it therefore cannot constitute ineffective assistance of counsel." *Id.* The

1 court noted that Mackey's own new trial motion asserted that "There is nothing to suggest that any 2 amount of diligence would have discovered and produced such fearful witnesses at the trial." *Id*. 3 (quoting Mackey's new trial motion). The court found that even if the self-defense witnesses had been 4 willing to testify, the self-defense theory was "bogus" because the witnesses were all of questionable 5 credibility, "there was no evidence of other gunshots, a second gun being fired, or other shell casings 6 at the scene. And there is no indication how Johnson could have sustained his numerous and severe 7 gunshot wounds as he remained in a standing position while shooting at Mackey." *Id*. at *12.

8 The Court of Appeal's decision is supported by the facts and is not contrary to or an 9 unreasonable application of *Strickland*. What defense to develop is left to the discretion of trial counsel. 10 *See Wainright v. Sykes*, 433 U.S. 72, 93 (1977) (counsel, not the client, has the "immediate – and 11 ultimate – responsibility of deciding if and when to object, which witnesses, if any, to call, and what 12 defenses to develop."). In opposition to the motion for a new trial, Mr. O'Sullivan submitted a 13 declaration stating that both of petitioner's previous attorneys told him to plead guilty as he had no 14 defense. *See* Answer, Ex.1 at 562 (Decl. of Joseph D. O'Sullivan). O'Sullivan also stated that in 15 reviewing "almost two years of investigations and statements," he found "no reference to any witnesses 16 who would testify that [petitioner] acted in self defense," *id.* at 494, and that none of petitioner's 17 previous attorneys, investigators, statements, or police reports referenced any of the witnesses who 18 would purportedly testify that petitioner acted in self-defense. *See id.* at 494-96. At trial, the victims 19 testified that they were threatened and offered money to not testify. *See id*., Ex. 11 at 167-70, 330-31 20 (RT, Vol. III of VIII). O'Sullivan stated that only after the victims appeared and testified did petitioner 21 seek to change the defense strategy. *See id*., Ex.1 at 498 (noting that after discussing all potential 22 defenses with petitioner, petitioner never indicated a desire to pursue a self-defense theory but insisted 23 that the complaining witnesses would not appear or testify in court). In fact, Billy Courtney, the only 24 witness who provided self-defense testimony at trial, also admitted that he had committed perjury and 25 was not actually able to see what he had testified to at trial. *See id.*, Ex. 11 at 554-72 (RT, Vol. V of 26 VIII). Furthermore, petitioner has not established that the jury would have reached a different verdict 27 because the evidence did not support a self-defense theory.

28

9

### II. Testimony of petitioner

Petitioner contends that O'Sullivan provided ineffective assistance by deciding not to have petitioner testify at the trial. The California Court of Appeal held that "O'Sullivan's advice and decision not to put Mackey on the stand was within the realm of professional competence." *Mackey*, 2006 WL 1120536, at *8. The court noted that "although during his first courtroom outburst Mackey announced his desire to testify, before the defense case he expressly informed the court he no longer wanted to. Mackey reached this decision after consultation not only with O'Sullivan, but also with conflicts counsel appointed for this very purpose. At no point thereafter did he ask the court for permission to testify in his own behalf. The fact that Mackey was not a witness does not indicate a violation of his constitutional rights." *Id*. The court held that "[s]ubstantial evidence indicated that Mackey agreed with the decision not to testify at the outset, until he realized his efforts to silence the complaining witnesses had not been successful." *Id*. In addition, the court held that "by declining to put Mackey on the stand, O'Sullivan prevented the jury from hearing of Mackey's prior criminal record, Mackey's potential motive for the shooting, and Mackey's gang affiliation," as well as insulating Mackey from cross-examination. *Id*. Finally, the court noted that O'Sullivan expressed the concern, outside of the presence of the jury, that putting Mackey on the stand would violate his ethical duties as an officer of the court. *Id*.

The California Court of Appeal's conclusion is supported by the facts and is not contrary to or an unreasonable application of *Strickland*. Petitioner does have a constitutional right to testify in his behalf. *See Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). However, the record indicates that during pre-trial motions, jury selection, as well as the commencement of trial, petitioner agreed with counsel's decision not to put petitioner on the stand. It was not until one of the victims, Alford Johnson, testified that petitioner's attitude changed dramatically. O'Sullivan stated that he advised petitioner against testifying and told petitioner that he had a legal obligation not to participate in such an endeavor. After petitioner struck O'Sullivan, O'Sullivan notified the court and counsel that for ethical reasons, he did not want to participate in petitioner taking the stand. Petitioner then met for 45 minutes with conflicts

1  counsel Freya Horne[2], at which point he notified the court that he no longer wished to testify.  At no
2  later point did he again assert a desire to testify, which effectively waived that right.  *See, e.g., United*
3  *States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990) (despite defendant's contention that counsel
4  refused to allow him to testify and that he was unaware of his right to testify, his silence at trial
5  effectively waived right to testify on his own behalf).

6        O'Sullivan's judgment in not allowing petitioner to testify was reasonable.  *See United States*
7  *v. Martinez*, 883 F.2d 750, 755 (9th Cir. 1989) (defendant's right to testify was not violated when
8  defense counsel advised defendant not to testify and defendant acted on his lawyer's advice and did not
9  testify despite his desire to do so).  As the Court of Appeal noted, if petitioner had testified, the jury
10 would have learned about his criminal record, which included assault of a police officer and attempted
11 carjackings, as well as his gang affiliation, motives behind the offenses, and petitioner's attempts to
12 threaten and bribe the victim witnesses so that they would not testify.  Under these circumstances, it was
13 reasonable not to have petitioner testify.  In addition, petitioner has made no showing that his testimony
14 would have produced a different outcome in the trial.  *See Strickland*, 466 U.S. at 687.

15       Petitioner also argues that it was "unnecessary, inappropriate, and prejudicial" for O'Sullivan
16 to tell the court he would not be a part of petitioner testifying on his own behalf.  First Amended
17 Petition, ¶ 25.  However, these comments were not prejudicial as they were made during a recess and
18 out of the jury's presence.

19 **III.    Investigation and trial**

20       Petitioner contends that O'Sullivan provided him ineffective assistance of counsel through
21 inadequate investigation and insufficient preparation.  Specifically, petitioner contends that O'Sullivan
22 should have asked for a continuance to look for defense witnesses and further investigate the case rather
23 than rely on the previous attorneys' files.  Petitioner also claims that O'Sullivan met with him only once
24 before trial.

25       The California Court of Appeal found Mackey's claims "unpersuasive."  *Mackey*, 2006 WL
26 1120526, at *9.

---

28    [2] Petitioner claims that O'Sullivan had a personal relationship with Ms. Horne prior to her appointment as conflicts counsel.  Both Ms. Horne and Mr. O'Sullivan denied that claim.

11

> Despite his spin on the record, there is sufficient evidence that O'Sullivan provided adequate assistance under the circumstances. As to the decision to proceed to trial right away, O'Sullivan maintained that he suggested seeking a continuance, but that Mackey rejected the idea because he was confident the victims would not testify against him. This account is consistent with the fact that, when the master calendar judge told Mackey on June 18 that trial would commence the following Monday with his new counsel, Mackey did not object or have O'Sullivan object, but instead *thanked* the judge. It is also consistent with the evidence that Mackey caused the victims to be threatened with violence if they dared to testify, and believed they would not appear.

*Id*. (emphasis in original). The Court of Appeal also found that "there was substantial evidence that O'Sullivan was able to prepare for trial effectively without obtaining a continuance." *Id*. O'Sullivan had access to the files of both of the previous attorneys on the case, which he reviewed and discussed with each of them. *Id.* The court also noted that O'Sullivan reviewed two years of investigators' statements and retained the investigator who had worked with Mackey's previous attorney due to his familiarity with the case, and that he filed motions to set aside the indictment and to dismiss the case, as well as several *in limine* motions. *Id.* In addition, the court rejected Mackey's complaint that O'Sullivan did nothing to look for witnesses: "O'Sullivan's statement [on the fifth day of trial that he thought the case before the jury would last one or two days], however, does not necessarily show that he declined to conduct an investigation; it could instead mean that the investigation he did undertake – including his review of two years of notes from prior counsel and defense investigators and his discussions with Mackey – led him to believe that no other witnesses would be appropriate." *Id.* at *10. The court also found that the fact that O'Sullivan had not interviewed certain witnesses until the tenth day of trial did not mean he did not interview other potential witnesses, if any there were. *Id.* Ultimately, the court held that "the shortcomings Mackey perceives in O'Sullivan's performance – failing to seek a continuance, adequately prepare, or search for witnesses – cannot compel reversal in this case unless they were *prejudicial* to Mackey." *Id.* (emphasis in original).

The Court of Appeal's decision is supported by the facts and is not contrary to or an unreasonable application of *Strickland*. Where the alleged ineffectiveness of counsel is due to a failure to investigate or discover potentially exculpatory evidence, the ineffectiveness inquiry will focus on the reasonableness of the attorney's investigation and advice. *See Langford v. Day*, 110 F.3d 1380, 1386 (9th Cir. 1997)). The record indicates that O'Sullivan, as the third attorney to represent petitioner, was reasonable in not seeking a continuance because petitioner was eager to begin trial as he believed the

12

victims would not testify. According to O'Sullivan's declaration, "I suggested that we continue the trial to allow me more time to prepare but Mr. Mackey was adamant that the case proceed to trial immediately." *See* Answer, Ex. 1 at 494 (Decl. of Joseph D. O'Sullivan). Therefore, when the court permitted O'Sullivan to be substituted in but informed petitioner that trial would begin in three or four days, O'Sullivan's decision not to object was reasonable. O'Sullivan advocated for his client through a number of motions, including motions attacking the grand jury indictment, motions *in limine* regarding gang affiliation, medical records, victim declarations, jury composition, among others. *Cf. Johnson v. Adams*, No. 07-55643, 2009 WL 605816, at *1 (9th Cir. Mar. 10, 2009) (defendant's second appointed counsel did not render ineffective assistance where counsel appeared in court on defendant's behalf on four occasions, retrieved and initiated his review of files prepared by previous attorney and conferred briefly with previous attorney, and his failure to make further preparations or to visit defendant was reasonable given defendant's uncooperative behavior).

The record also supports the Court of Appeal's findings with regard to O'Sullivan's investigation of potential witnesses. Counsel, not the client, has the responsibility of determining which witnesses to call. *See Wainright*, 433 U.S. at 93. O'Sullivan interviewed witnesses during the trial and decided to have several testify at trial. Petitioner has not shown any deficiency in O'Sullivan's performance in this regard. *See Greene v. Henry*, 302 F.3d 1067, 1072 (9th Cir. 2002) (state court's determination that defendant was not prejudiced by defense counsel's failure to call various witnesses was not an unreasonable application of *Strickland* and thus did not warrant habeas relief); *see also Owens v. Runnels*, No. 07-15708, 2008 WL 56019, at *1 (9th Cir. Jan. 3, 2008) (defendant was not denied effective assistance of counsel due to counsel's failure to call witnesses who saw different party running from crime scene in light of evidence implicating petitioner at trial).

**IV.   Instructions to disrupt the court**

Petitioner also contends that O'Sullivan instructed him to disrupt the court in front of the jury in order to "discredit himself in the case so Mr. O'Sullivan could shift the blame for the coming disaster to petitioner and to distract attention from Mr. O'Sullivan's own ineffective, unreasonable representation." First Amended Petition ¶ 24. Specifically, petitioner contends that O'Sullivan advised him to complain to the judge and swear in the jury's presence in order to obtain a mistrial and when that

13

was unsuccessful, O'Sullivan instructed petitioner to strike him. *See id.*

The California Court of Appeal rejected this claim, holding that "[s]ubstantial evidence supports the conclusion that Mackey's violence was not prompted by O'Sullivan's or MacArthur's advice." *Mackey*, 2006 WL 1120536, at *13. The court noted that both O'Sullivan and MacArthur disputed Mackey's accusations in sworn declarations filed with the court. *Id.*

> Based on the evidence presented, it is not reasonable to conclude that O'Sullivan instructed Mackey to hit him in the courtroom. It appears far more likely that Mackey, confronted with his failed attempt to intimidate his victims from testifying, his failure to obtain a delay by requesting new counsel in the middle of trial, and his failure to obtain a mistrial with a verbal outburst, resorted to hitting his attorney in front of the jury in a last-ditch effort to orchestrate a mistrial.

*Id.* Furthermore, the court noted that even if O'Sullivan *did* encourage petitioner's outburst, petitioner did not establish that he was prejudiced because after each outburst, the trial court questioned the jurors and excused three jurors who indicated that petitioner's disruption might prevent them from being impartial. *Id.*

The California Court of Appeal's finding is supported by the facts and is not contrary to or an unreasonable application of *Strickland*. Considering the trial transcript, petitioner's petition and memorandum, as well as the declarations of O'Sullivan and MacArthur, there is nothing in the record that would amount to clear and convincing evidence that the state appellate court's determination was wrong. *See id.* In fact, the record includes compelling evidence in support of the court's finding. In his declaration, O'Sullivan states:

> At no time did I ever advise Mr. Mackey and or encourage him to strike me and or do anything else that would disrupt the trial. I am and was aware that a defendant cannot occasion a new trial by his own misbehavior and to do so would be an exercise in folly with negative ramifications.

Answer, Ex. 1 at 494. Investigator MacArthur also disputed petitioner's claim, stating that he never encouraged or even spoke with petitioner about such an assault. *See id.* at 498. Thus all the evidence in the record, aside from petitioner's own petition and memorandum, refutes petitioner's claims.

In sum, petitioner fails to establish he was prejudiced by counsel's conduct because the overwhelming evidence indicates petitioner's guilt. Petitioner's attempt to avoid being apprehended, his violent threats and bribes of the victim witnesses, as well as his inability to provide any exculpatory evidence all demonstrate that he was not denied effective assistance of counsel.

## CONCLUSION

The Court finds O'Sullivan's performance was within the objective standard of reasonableness. Even if petitioner could establish that O'Sullivan's representation was sub-standard, petitioner has not shown prejudice. Accordingly, the Court finds that the state court's rejection of petitioner's claim for ineffective assistance of counsel was not contrary to or an unreasonable application of clearly established federal law as set out by the U.S. Supreme Court in *Strickland v. Washington*.

For the foregoing reasons and for good cause shown, the Court hereby DENIES petitioner's petition for writ of habeas corpus. [Dkt. No. 1]

**IT IS SO ORDERED.**

Dated: July 13, 2009

SUSAN ILLSTON
United States District Judge